UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Anthony J. Fallaw, | ) | Civil Action No. 5:21-1889-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil

Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition

for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial

review of a final decision the Commissioner of Social Security ("Commissioner"), denying his claim

for Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having

carefully considered the parties' submissions and the applicable law, the court reverses and remands

the Commissioner's decision for further administrative action as discussed herein.

I.    Relevant Background

A.    Procedural History

On June 21, 2018, Plaintiff protectively filed for SSI, initially alleging he became disabled on

May 15, 2011. Tr. 60-61. Plaintiff subsequently amended his alleged onset date to June 21, 2018, his

application-filing date. Tr. 10, 227.[2] After being denied initially, Tr. 58, and upon reconsideration,

Tr. 71, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 99. The ALJ

conducted a hearing on December 2, 2020. Tr. 35. The ALJ denied Plaintiff's claim in a decision

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Kilolo Kijakazi for Andrew Saul as Defendant in this action.
[2] Plaintiff's application is dated July 26, 2018, but his protective filing date is June 21, 2018. Tr. 10, 151-60, 227.

dated December 17, 2020. Tr. 7-24. Plaintiff requested review of this decision from the Appeals Council. Tr. 186-87. On May 15, 2020, the Appeals Council denied the request, Tr. 1-6, making the ALJ's December 17, 2020 decision the Commissioner's final decision for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed June 21, 2021. ECF No. 1.

B.      Plaintiff's Background

Born October 27, 1976, Plaintiff was 41 years old at the time of his alleged onset date and 44 at the time of the administrative hearing. Tr. 19, 39, 60. In his July 26, 2018 Disability Report-Adult form, Plaintiff indicated he had completed the 9th grade; he did not attend special education classes and did not complete specialized training. Tr. 174-75. Plaintiff indicated he worked as a laborer for a cleaning service from 2009 through 2012;[3] he also worked as a laborer in the manufacturing field in 2011. Tr. 175. Plaintiff indicated that on May 15, 2011, his conditions of panic disorder and hypertension became severe enough to keep him from working. Tr. 174. Plaintiff indicated he was 6' tall, weighed 215 pounds, and his conditions caused him pain or other symptoms. *Id.*

In a Disability Report-Appeal dated January 2, 2019, Plaintiff indicated a change in his medical condition that occurred in October 2018. Tr. 193. Plaintiff stated that his paranoia, insomnia, social anxiety, depression, memory loss, and inability to concentrate and focus were all worse; he stated his panic attacks were more frequent. *Id.* In another Disability Report-Appeal dated October 15, 2019, Plaintiff reported another change: in June 2019 he was placed on a CPAP for insomnia. Tr. 203.

---

[3] Plaintiff also notes in the same report that he stopped working on May 15, 2011 because of his conditions. Tr. 174.

C.    Administrative Proceedings

On December 2, 2020, Plaintiff appeared with counsel at an administrative hearing and testified regarding his application for SSI. Vocational Expert ("VE") Joann Hayward also testified. Tr. 35. Because of the extraordinary circumstance presented by the COVID-19 Pandemic, the hearing was conducted by telephone. Tr. 10, 37.

1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff indicated he was 44 years old and had a 9th grade education but had not gotten a GED. Tr. 39-40. Plaintiff indicated he lived in a mobile home with his significant other/common-law wife and their cat. Tr. 40. Plaintiff said he had a driver's license. Tr. 40.

In response to questions from counsel, Plaintiff testified that the reason he could not work was because he had "real bad panic attacks, and just I have them all the time, and I don't want to be around anybody. It always hits, you know." Tr. 41. Plaintiff said Ms. Lisa Cometto at Beckley Mental Health Center was treating him for the panic attacks. He said he saw Cometto every two or three months and saw a therapist there every two weeks. Tr. 41. Plaintiff said he was still taking medications prescribed by Cometto. Tr. 42. Counsel listed those medications as being clonazepam, hydroxyzine, venlafaxine, trazodone, and buspirone; Plaintiff said he was still taking all of those. Tr. 42. In response to the ALJ's question about the buspirone, Plaintiff indicated it had been "added here and there somewhere, you know, a few times." Tr. 42. Plaintiff testified that he experienced panic attacks "[a]t least [] once or twice a day." Tr. 43. He said the attacks lasted from 20 to 30 minutes up to an hour or so. Tr. 43. Plaintiff said there were no particular triggers that brought the attacks on. Plaintiff explained that the attacks "just kind of come on, and then [he] start[s] feeling up and down, and [he has] heart palpitations, and soon [] [his] heart starts acting up." Tr. 43. Plaintiff said his heart would start racing very fast, he felt he could not breathe, and he felt like he was "going to die." Tr. 43.

3

Plaintiff said the last time he had left the house was to ride up to the store with his sister; he stayed in the car and did not go into the store. Tr. 43-44. Plaintiff said the last time he had driven was several days prior when he had to go assist a family member with a broken-down truck. Tr. 44-45. Plaintiff indicated he did not want to have to be around other people outside of his house. Tr. 45.

Plaintiff said he had contacted EMS and had the ambulance go out to his house a number of times because he would feel like he was having a heart attack. Tr. 45. Plaintiff said he would take another Klonopin[4] just sit there, thinking "everything is going to be okay, but [he] call[s] the ambulance just to the point where—[he] thought [he] was dying." Tr. 45. Plaintiff noted he had very high blood pressure. Tr. 45. Plaintiff said the EMS personnel would go to his house and "sit and talk to [him] until [he] calm[s] down[.]" Tr. 46. Plaintiff confirmed that, each time, he would feel as if he were dying. Tr. 46.

Plaintiff said he used a CPAP machine at night, but could not wear it much because he would become claustrophobic. Tr. 46. Plaintiff said he could not sleep well and got about an hour of sleep each night. Tr. 46-47. He said he would "doze in and off" throughout the day. Tr. 47.

Plaintiff indicated he had taken his medications that morning. Tr. 47. He described the side effects of his medication as making him drowsy, dizzy, very tired, and sleepy. Tr. 47.

Plaintiff said he spent most of his time in bed in his room and did not watch much television. Tr. 47-48. He said he could not follow a 30-minute television program because his "mind just races off." Tr. 48. Plaintiff said the woman with whom he lives usually worked during the day but was unemployed at the moment. Tr. 48. When she was working Plaintiff would talk with her on the phone throughout the day. Tr. 48. Plaintiff indicated he guessed the mental-health medications he was taking were helping although he still had the panic attacks. Tr. 48-49.

---

[4] Klonopin (clonazepam) is used to "control certain types of seizures. It is also used to relieve panic attacks (sudden, unexpected attacks of extreme fear and worry about those attacks)." https://medlineplus.gov/druginfo/meds/a682279.html#why (last viewed July 25, 2022).

Plaintiff said the reason he had not held a long-term job anywhere was because "kn[e]w" he was "going to have panic attacks" and he felt "like everybody is—everything is just closing in on [him], or something." Tr. 49.

## 2. VE's Testimony

The ALJ noted Plaintiff had no past relevant work ("PRW") for purposes of the hearing. The ALJ instructed the VE to advise him if any of her opinions conflicted with information contained in the Dictionary of Occupational Titles ("DOT") or its companion publications. The VE indicated she would do so. Tr. 51. The ALJ then asked VE Hayward to assume a hypothetical individual of a younger age with limited education and no past relevant work. Tr. 51. The ALJ set out the following for hypothetical number one:

> [O]ver the course of an eight-hour workday in two-hour increments this person can perform work at all exertional levels with the following nonexertional restrictions. . . . This person can occasionally be exposed to hazards associated with unprotected dangerous machinery, or unprotected heights.
> This person can concentrate, persist, and maintain pace, understand, remember, and carry out unskilled routine tasks, with a GED reasoning code of two, or less, and a low stress work environment that we'll define as being free of fast-paced, or team-dependent production requirements.
> This person can adapt to occasional workplace changes.
> This person can perform jobs where they're largely isolated from the general public, dealing with data, and things, rather than people.
> This person can perform jobs where the work duties can be completed independently from coworkers; however, physical isolation is not required.
> And, finally, this person can respond appropriately to supervision.

Tr. 51-52. The ALJ asked whether there was any work this hypothetical individual could perform, and the VE indicated there would be. Tr. 52. The VE identified the following as work that could be performed: eyedropper assembler, DOT code 739.687-086, sedentary, SVP 2, with 229,000 jobs in the national economy; garment sorter, DOT code 222.687-014, light, SVP 2, 229,000 jobs in the national economy; hand packager, DOT code 920.587-018, medium, SVP 2, 676,000 jobs in the national economy. Tr. 52-53.

For hypothetical two, the ALJ added to the restrictions of hypothetical one that the person could maintain sufficient concentration, persistence, and pace for 75 percent of the workday but would be off-task an average of 25 percent of the workday beyond normal work breaks. Tr. 53. This person would also be absent from work on average three or more days per month. Tr. 53. The VE opined all work was precluded for this hypothetical person. Tr. 53.

The VE confirmed that the DOT did not directly address things such as time-off-task, absenteeism, work's social demands, or the Commissioner's definition of low-stress work. That portion of her opinion was informed by her vocational education, training, and experience. Tr. 53-54.

Plaintiff's counsel then asked whether, using the ALJ's hypothetical but dropping time-off-task down to 15 percent of the day and absences to two days per month, there would be any jobs. Tr. 54. The VE indicated there would not—either of those limits would still be work-preclusive. Tr. 54. The VE also indicated the individual's inability to appropriately interact with supervisors or maintain appropriate supervision would also be work-preclusive. Tr. 54.

After a brief closing statement by Plaintiff's counsel, the hearing was closed. Tr. 55-57.

II.     Discussion

A.     The ALJ's Findings

In his December 22, 2020 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant has not engaged in substantial gainful activity since June 21, 2018, the application date and the amended alleged onset date (20 CFR 416.971 *et seq.*).
>
> 2.     The claimant has the following severe impairment:  generalized anxiety disorder (20 CFR 416.920(c)).
>
> 3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

6

4.      After careful consideration of the entire record, the undersigned finds that over the course of an eight-hour workday, in two-hour increments, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can occasionally be exposed to hazards associated with unprotected dangerous machinery or unprotected heights; the claimant can concentrate, persist, and maintain pace to understand, remember, and carry out unskilled, routine tasks, with a GED reasoning code of 2 or less, in a low stress work environment (defined as being free of fast-paced or team-dependent production requirements); the claimant can adapt to occasional work place changes; the claimant can perform jobs where the worker is largely isolated from the general public, dealing with data and things rather than people; the claimant can perform jobs where the work duties can be completed independently from coworkers, however, physical isolation is not required; and the claimant can respond appropriately to supervision.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on October 27, 1976 and was 41 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since June 21, 2018, the date the application was filed and the amended alleged onset date (20 CFR 404.920(g)).

Tr. 12-13, 15, 19-20.

B.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial

evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.     Analysis

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence in several ways: (1) the ALJ did not adequately evaluate the opinion of treating mental health provider Lisa Cometto, FNP ("NP Cometto"); (2) the ALJ did not properly evaluate Plaintiff's symptoms in formulating Plaintiff's RFC; and (3) the term "fast-paced" was not adequately defined. Plaintiff also submits that the Commissioner's final decision denying benefits was constitutionally defective. Pl. Br. 1, ECF No. 18.[6] The Commissioner contends that substantial evidence supports the ALJ's decision finding that Plaintiff was not disabled and that Plaintiff has not set out a constitutional issue that would necessitate remand. Def. Br., ECF No. 20.

To consider Plaintiff's allegations of error as to the ALJ's consideration of Plaintiff's symptoms and of the opinion evidence the court first sets out relevant related evidence.

A.   Medical evidence

---

[6] In Plaintiff's principal brief, he discusses the constitutional argument first. However, the court will save this argument for last.

1.  Treatment by and opinion of treating source NP Cometto

Plaintiff indicated he began being treated by mental health care provider Beckman Center—where NP Cometto practices—in 2016, which is several years prior to his June 2018 alleged onset date. Tr. 177. No treatment records from 2016 have been provided. Pre-onset records indicate Plaintiff saw NP Cometto on June 14, 2017, October 4, 2017, and February 26, 2018, and was diagnosed with generalized anxiety disorder. Tr. 238-45. At the February 2018 visit Plaintiff noted his mood had been stable, he was taking medication (Klonopin) for anxiety, and he was not receiving therapy. Tr. 240. On June 20, 2018—the day before his alleged onset date—Plaintiff saw NP Cometto in follow-up and indicated he was, "fine, I guess." Tr. 238. He indicated his mood was stable, he continued to take Klonopin but was not receiving therapy. Tr. 238. He indicated he had sleep apnea and trouble sleeping. Tr. 238.

Plaintiff saw NP Cometto in follow-up on October 10, 2018, noting he was doing "all right." Tr. 317. Plaintiff's primary diagnosis continued to be "generalized anxiety disorder." Tr. 317. He reported he was taking his medication (Klonopin) and seeing a therapist. Tr. 317. Plaintiff also reported he had experienced a panic attack but had not gone to the ER for it. Tr. 317. He indicated the panic attacks were "triggered by disturbing thoughts, but other times happen[ed] for no reason at all." Tr. 38. Plaintiff reported that otherwise his mood was alright. Tr. 317. On examination Plaintiff's behavior was noted to be calm, his thought processes logical/goal directed, his mood euthymic, his affect appropriate. His concentration and attention were "intact"; his judgment and insight were "fair." Tr. 317.

Plaintiff again saw NP Cometto on May 20, 2019. Tr. 335. He indicated he was doing "the same, describe[d] his mood as 'not good sometimes', had to call the ambulance due to a panic attack last month." Tr. 335.[7] Plaintiff indicated he had not been admitted to the hospital and that he was

---

[7] Greenwood County EMS records document Plaintiff contacted EMS approximately ten times

"resistant to start another medication." Tr. 335. Plaintiff said he was taking Klonopin as prescribed. Tr. 335. He denied having medication side effects, depressive symptoms, or manic symptoms. Tr. 335. On examination Plaintiff's behavior was noted to be calm, his thought processes logical/goal directed, his mood euthymic, his affect appropriate. His concentration and attention were "intact"; his judgment and insight were "fair." Tr. 335. Plaintiff was again diagnosed with generalized anxiety disorder. Tr. 335. On examination Plaintiff's behavior was noted to be calm, his thought processes logical/goal directed, his mood euthymic, his affect appropriate. His concentration and attention were "intact"; his judgment and insight were "fair." Tr. 335.

Plaintiff returned to NP Cometto on September 16, 2019. Tr. 344. Plaintiff indicated his mood had been "up and down[,]" and noted he was seeing his therapist and making some progress. Tr. 344. Plaintiff indicated he was using a CPAP mask but still having some trouble sleeping. Tr. 344. He noted he was "'not doing a whole lot during the day,'" and was advised that lack of activity could negatively impact his sleep. Tr. 344. Plaintiff reported he had stopped taking Paxil[8] because it was "making [him] feel funny." Tr. 344. He said he continued to have "occasional panic attacks and dysthymic mood." Tr. 344. During that visit Plaintiff denied anxiety symptoms. Tr. 344. He also denied medication side effects and manic symptoms. Tr. 344. His primary diagnosis continued to be generalized anxiety disorder. Tr. 344. NP Cometto noted that Plaintiff had "tried multiple antidepressants and generally has been resistant to the medications." Tr. 345. She indicated he would be continued on his current treatment. Tr. 345.

---

between September 2018 and August 2020, complaining of panic attacks. Some of those calls resulted in transport to the ER; some involved on-scene treatment by EMTs. Tr. 387-512; 529-51; 556-98 (Exhibits 8F, 9F, 12F, 14F). *See* Tr. 17 (ALJ's discussion of emergency treatment).

[8] At the September 16, 2019 visit NP Cometto listed Plaintiff's prescribed medications as Paxil 10 mg; ½ tablet once a day; and Klonopin, 2 mg, 1 table twice a day as needed. Tr. 344. Paxil, or paroxetine, is used to treat depression, panic disorder, and social anxiety disorder. https://medlineplus.gov/druginfo/meds/a698032.html (last viewed July 29, 2022).

Plaintiff followed up with NP Cometto on January 15, 2020. Tr. 346. At this visit Plaintiff reported that he was having panic attacks daily. Tr. 346. Plaintiff said he was "always anxious." Plaintiff "does not seem to be able to use coping skills or to understand that it is a panic attack and not a more serious health problem." Tr. 346. Plaintiff was unable to identify any causative issues. Tr. 346. He reported he "always has a sense of impending doom[,] . . . is paranoid, feels that others are talking about him or watching him. For this reason [he] avoids being around others." Tr. 346. On examination Plaintiff's behavior again was noted to be calm, his thought processes logical/goal directed, his mood euthymic, his affect appropriate. His concentration and attention were "intact"; his judgment and insight were "fair." Tr. 346. These treatment notes indicated Plaintiff was taking his medications as prescribed and denied medication side effects. Tr. 346. Plaintiff's mental-health medications were changed: his Klonopin prescription was increased to 2 mg tablets, three times per day, as needed; and he was also prescribed hydroxyzine HCL (N),[9] 25 mg, 1 tablet three times per day as needed. Tr. 347. NP Cometto noted, "[h]ave suggested and informed [Plaintiff] that he should really be on a daily medication to target his anxiety but he does not want to do this." Tr. 346.

On March 11, 2020, Plaintiff saw NP Cometto for follow up, and indicated he was "fine." Tr. 348. The notes indicate Plaintiff "is not doing any better, is still having panic attacks, paranoia and irritability." Tr. 348. He continues to refuse to take SSRI medications that would target these symptoms, indicating he is fearful that he "will die." Tr. 348. Plaintiff continues to receive counseling. The notes indicate Plaintiff has built up a resistance to Klonopin, and the dose cannot be pushed any higher. Tr. 348. Notes indicate having tried to augment the Klonopin with Buspar (buspirone)[10] and Vistaril (hydroxyzine) without much success. Tr. 348. Notes indicated he was taking medications as

---

[9] Hydroxyzine is used "alone or with other medications in adults and children to relieve anxiety and tension." https://medlineplus.gov/druginfo/meds/a682866.html (last viewed July 26, 2022).
[10] Buspirone is an anxiolytic used to treat anxiety disorders or in the short-term treatment of anxiety symptoms. https://medlineplus.gov/druginfo/meds/a688005.html (last viewed July 26, 2022).

prescribed and reported no side-effects; the medications listed are Klonopin and hydroxyzine HCL. Tr. 348. Plaintiff was also prescribed Effexor XR,[11] 37.5 mg, 1 capsule once per day. Tr. 349. This was added to "target panic attacks and depressed symptoms." Tr. 349. In noting Plaintiff's primary diagnosis continued to be generalized anxiety disorder, NP Cometto again noted, "[h]ave suggested and informed [Plaintiff] that he should really be on a daily medication to target his anxiety but he does not want to do this." Tr. 348. On examination Plaintiff's behavior was noted to be calm, his thought processes logical/goal directed, his affect appropriate. Plaintiff's mood was noted to be "depressed." Tr. 348. His concentration and attention were "intact"; his judgment and insight were "fair." Tr. 348.

On May 13, 2020, Plaintiff had a tele-health (audio and video) visit with NP Cometto. Tr. 513 (noting the visit was virtual because of the COVID-19 emergency). Plaintiff indicated he was "OK." Tr. 513. Plaintiff said he was taking his medications and was unsure whether Effexor was helping. Tr. 513. Plaintiff said he still felt anxious and feared he would die. Tr. 513. He recounted a visit to the ER when having a panic attack triggered by his wife leaving town and taking his medication with her. Tr. 513. Plaintiff advised he believed the Klonopin was "fine and [was] resistant to med changes." Tr. 513. Plaintiff denied irritability, depressed mood, and psychosis. Tr. 513. During the AV visit NP Cometto noted Plaintiff was "calm and pleasant, but uncomfortable less than usual." Tr. 513. Plaintiff said he was taking medications as prescribed and denied medication side effects. Tr. 513. He denied depressive symptoms. Tr. 513. Plaintiff was again prescribed Klonopin, Effexor XR, and hydroxyzine HCl. NP Cometto also added a prescription for buspirone, 5 mg, 1 tablet twice per day as needed. It was noted this was added for anxiety. Tr. 514. NP Cometto again noted Plaintiff's resistance to daily

---

[11] Effexor XR, is a brand name for venlafaxine and is used to treat depression as well as generalized anxiety disorder, social anxiety disorder, and panic disorder. It is in a class of medications called selective serotonin and norepinephrine reuptake inhibitors (SNRIs). https://medlineplus.gov/druginfo/meds/a694020.html#why (last viewed July 26, 2022).

medication to target his anxiety. Tr. 513. On examination Plaintiff's behavior was noted to be calm, his thought processes logical/goal directed, his affect appropriate. Plaintiff's mood was noted to be "anxious." Tr. 513. His concentration and attention were "intact"; his judgment and insight were "fair." Tr. 513.

On August 19, 2020, Plaintiff had another telehealth visit with NP Cometto. Tr. 515. Plaintiff said he was "all right." Tr. 515. Notes indicate he was "still doing the same, remains anxious, isolative and agoraphobic." Tr. 515. Plaintiff said he continued to take his medications but he had "not really been able to improve much." Tr. 515. His mood was depressed, some of which is attributable to "finances and relational issues." Tr. 515. Plaintiff said he had passive suicidal thoughts but no intent or plan. He was tearful at the appointment. Tr. 515. Plaintiff said he was taking medications as prescribed and denied medication side effects. Tr. 515. On examination Plaintiff's behavior again was noted to be calm, his thought processes logical/goal directed, his mood euthymic, his affect appropriate. His concentration and attention were "intact"; his judgment and insight were "fair." Tr. 515.

On October 29, 2020, treating mental health provider Lisa Cometto, FNP, completed a Medical Source Statement (Mental). Tr. 552-54. In the "Making Occupational Adjustments" section, NP Cometto opined Plaintiff could frequently use judgment, occasionally follow work rules and function independently, rarely relate to coworkers and maintain attention/concentration, and never deal with the public or work stresses or interact with supervisors. Tr. 552. In support, NP Cometto stated, "[Plaintiff] is one of the most anxious people that we have ever seen in the clinic. Has severe agoraphobia, paranoia and fear of dying." Tr. 552. In the "Making Performance Adjustments" section, NP Cometto found Plaintiff could occasionally understand, remember, and carry out simple job instructions, rarely understand, remember, and carry out detailed but not complex instructions, and never understand, remember, or carry out complex job instructions. Tr. 553. NP Cometto explained

as follows; "Intellectual ability is normal but his anxiety makes it difficult to maintain the concentration needed to maintain a regular work schedule." Tr. 553. In the "Making Personal-Social Adjustment" section, NP Cometto opined Plaintiff could frequently demonstrate reliability, occasionally maintain personal appearance, and rarely behave in an emotionally stable manner or relate predictably in social situations. Tr. 553. NP Cometto noted Plaintiff showed up for his appointments but she was unaware of whether he showed up for other responsibilities. Tr. 553. In the "Ability to Work" section, NP Cometto opined Plaintiff's mental impairments required him to exceed the number of usual breaks during an eight-hour work day and interfered with the completion of an eight-hour work day. Tr. 553. She estimated Plaintiff's impairment and treatment would cause him to be absent from work more than four days per month. Tr. 554. Craving reference to "medical PMA notes," NP Cometto indicated Plaintiff's impairments were "reasonably consistent with the symptoms and functional limitations described in this evaluation." Tr. 554. She further noted Plaintiff was "on medication that can impair concentration, cause drowsiness and confusion." Tr. 554. NP Cometto opined Plaintiff would be capable of managing benefits in his own best interest. Tr. 554.

2. Agency experts' opinions

The record also includes opinions from State agency psychological consultants.[12] On November 14, 2018, Xanthia Harkness, Ph.D., an expert State agency psychologist, reviewed Plaintiff's medical records at the initial level and offered her opinion. Tr. 60-69. Dr. Harkness opined Plaintiff had a severe impairment of "anxiety and obsessive-compulsive disorders." Tr. 64. Dr. Harkness opined Plaintiff had the areas of understanding, remembering or applying information ability to concentrate, persist, or maintain pace; and ability to adapt or manage oneself. Tr. 64. She

---

[12] The record also includes opinions by State agency medical experts. Tr. 60-69, 72-83 (Exhibits 2A and 5A). The ALJ also evaluated and considered their findings, finding them to be "persuasive." Tr. 18. The ALJ further notes Plaintiff's representative has not alleged Plaintiff had no physical severe impairments. Tr. 19. As Plaintiff's physical condition is not at issue, the court need not discuss the opinions of the State agency medical experts herein.

opined Plaintiff had moderate limitations in the ability to interact with others. Tr. 64. In offering her opinion as to Plaintiff's mental RFC, Dr. Harkness opined Plaintiff would be moderately limited in his ability to interact with the general public and his ability to accept and respond to criticism from supervisors. Tr. 66. She indicated Plaintiff would be able to get along with coworkers, ask simple questions, and maintain socially appropriate behavior. Tr. 66. Dr. Harkness opined Plaintiff could understand, remember, and carry out "simple to detailed instructions," attend to and perform simple-to-complex tasks for at least two-hour periods, make simple work-related decisions, and sustain appropriate interaction with peers and co-workers. Tr. 67. Dr. Harkness opined Plaintiff would respond appropriately to changes in a work setting. Tr. 67.

In August 2019, Vicki Prosser, Ph.D., reviewed Plaintiff's medical records at the reconsideration level and affirmed Dr. Harkness's assessment. Tr. 81. Dr. Prosser opined Plaintiff had reported "far more limits" than were supported by his treatment. Tr. 79.

NP Cometto's opinion had not been rendered at the time Dr. Prosser and Dr. Harkness reviewed Plaintiff's records and rendered their opinions. Tr. 67, 81 (noting the record included no opinions by treating sources).

3. Treatment by other providers

The record also contains notes from Plaintiff's treatment by his general practitioner, Veronica Hinkle, FNP at Uptown Family Practice, as well as medical records from Plaintiff's seeking emergency medical assistance for panic attacks. Relative to his mental health, the records from Uptown Family Practice indicate that, on October 17, 2018, Plaintiff was noted to have anxiety and depression; however, the psychiatric portion of his physical examination indicated his mood and affect were normal. Tr. 326. On October 24, 2019, Plaintiff appeared with complaints concerning hypertension and issues with sleeping. Tr. 336. FNP Hinkle noted Plaintiff had a normal mood and affect and normal behavior. Tr. 337-38. On April 22, 2019, FNP Hinkle examined Plaintiff, who had

presented for follow up as to sleep problems. Plaintiff's anxiety was noted; however, his mood and affect were normal. Tr. 341-43. On August 28, 2020, Plaintiff's "Review of Systems" indicated he was "nervous/anxious" and with dysphoric mood. Tr. 518. On physical examination his mood, behavior, thought content, and judgment were found to be normal. Tr. 518. It was also noted that Plaintiff had been to the emergency department because of anxiety. Tr. 517.

Exhibit 9F includes April and May 2020 records from Self Memorial Hospital System. Tr. 423-512. Plaintiff went to the ER on April 21, 2020 after accidentally taking a double-dose of blood pressure medication. Tr. 423. Plaintiff informed the provider he may have been having a panic attack. Tr. 425. His psychiatric/behavioral findings were "negative." Tr. 426. On examination, his mood was noted to be anxious; his behavior, thought content, and judgment were normal. Tr. 427. Plaintiff returned to the ER on April 25, 2020, presenting with chest pain; he was diagnosed with Klonopin withdrawal; he noted he was out of his Klonopin prescription. Tr. 444, 447. Plaintiff was noted to be nervous/anxious; he was not confused. Tr. 448. He was noted to have difficulty concentrating. Tr. 448. His behavior was noted to be agitated and mood anxious. His speech and thought content were normal. Tr. 449. Plaintiff was provided with enough Klonopin for two days but was advised to return to mental health provider for ongoing medication. Tr. 449. Plaintiff returned to the ER on May 17, 2020, with complaints of weakness and a racing heart. Tr. 477. He indicated he had run out of some medications. He denied chest pain. Tr. 477. Plaintiff was found to have no confusion and in no distress. Tr. 478. He was alert and oriented. Tr. 479. During the May 17, 2020 visit Plaintiff's urine drug screen was positive for amphetamines. Tr. 499.

In addition to the above ER visits, the record includes information regarding several calls to Greenwood County EMS that did not result in transport to the ER. Tr. 529-51. Plaintiff contacted EMS on September 29, 2018. When EMS arrived Plaintiff was in no apparent distress but noted he was aware he had had a panic attack. Tr. 530. He said that when he called EMS he had felt short of

breath. Tr. 530. He was not transported to the ER. Tr. 530. Plaintiff called EMS again on May 13, 2019 with complaints of chest pain. Tr. 533. When EMS arrived Plaintiff was hyperventilating, but EMS personnel worked with him to get him to slow his breathing. Tr. 533. After he calmed down Plaintiff declined transport to the ER. Tr. 533. Plaintiff contacted EMS again on June 29, 2019 with complaints of chest pain. Tr. 535. Plaintiff reported he had had a little anxiety all day but it had gotten worse. Tr. 535. Plaintiff was calmed down and refused transport to the ER. Tr. 535. On November 24, 2019, EMS was dispatched and found Plaintiff alert and oriented but very jittery, shaking, and breathing rapidly. Tr. 540. Plaintiff indicated he had anxiety; he said he had taken an alprazolam tablet[13] two hours before. He acknowledged he had been drinking. EMS crew coached Plaintiff on his breathing, which helped him to relax and to lower his heart rate. Plaintiff refused EMS transport to the ER. Tr. 540. Plaintiff contacted EMS on May 29, 2020; when EMS arrived Plaintiff was short of breath. Tr. 546. He advised he had anxiety and was out of his medication. He believed he was having an anxiety attack. Tr. 546. Plaintiff declined transport to the ER. Tr. 546. Plaintiff called EMS again on June 27, 2020 when he had breathing problems. Tr. 550. Plaintiff advised that he suffered from anxiety attacks and could not get that one to go away. Tr. 550. Plaintiff was coached to slow his breathing. Plaintiff began to feel better and indicated he believed the anxiety attack had passed. He refused transport to the ER. Tr. 550.

B. Consideration of symptoms

The court first considers Plaintiff's argument that the ALJ erred in his consideration of Plaintiff's symptoms. Pl. Mem. 16-19. When evaluating a claimant's symptoms (sometimes discussed as "subjective complaints"), the ALJ is required to ascertain whether a claimant has a medically determinable impairment that could reasonably cause the symptoms alleged and then evaluate the

---

[13]    Alprazolam    is    used    to    treat    anxiety    disorders    and    panic    disorder. https://medlineplus.gov/druginfo/meds/a684001.html (last viewed Aug. 3, 2022).

intensity and persistence of the claimant's symptoms to determine whether they limit his capacity to work. 20 C.F.R. § 416.929; SSR 16-3p, 2016 WL 119029, at *2 (Mar. 16, 2016).

Here, the ALJ considered Plaintiff's allegations and found that his medically determinable impairments could reasonably be expected to cause the symptoms. Tr. 16. However, after considering all of the evidence of record, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence of record. Tr. 16. The ALJ contrasted Plaintiff's allegations that he experienced two panic attacks daily with medical documentation showing he had "only sought emergency treatment for such on ten occasions since the amended alleged onset date." Tr. 17 (listing ten dates ranging from September 2018 to August 2020). The ALJ characterized Plaintiff's treatment history as "conservative," noting Plaintiff had not required inpatient or intensive outpatient treatment. Tr. 17. The ALJ found the following regarding Plaintiff's medication history:

> [N]otes from his mental health provider indicate that the claimant has refused additional medications to target his general anxiety (Exhibit 1F/3 [Tr. 238]; Exhibit 3F/5 [Tr. 319]; Exhibit 5F/7 [Tr. 335]; Exhibit 7F/3, 5 [Tr. 345, 348]; Exhibit 10F/1, 3 [Tr. 513, 515]). For the most part, the claimant has been prescribed Klonopin as needed and psychotherapy. There have been few changes in his medication since 2017, with the exception of Buspirone being added in May 2020 (Exhibit 1F; Exhibit 3F; Exhibit 5F; Exhibit 7F; Exhibit 10F).

Tr. 17.

Plaintiff submits the ALJ's evaluation of Plaintiff's symptoms "is not supported by substantial evidence because it does not adequately or accurately reflect the nature of his mental impairments and the barriers to successful management of such symptoms." Pl. Mem. 18-19. More particularly, Plaintiff takes issue with the ALJ's characterization of Plaintiff's medication history as one of "few changes." Pl. Mem. 17 & n.80 (citing records indicating multiple medication changes and adjustments because of side effects or ineffectiveness). Significantly, Plaintiff points out NP Cometto's March 2020 notation that Plaintiff continued to refuse certain medications (SSRIs) that would target

Plaintiff's symptoms of panic attacks, paranoia, and irritability because he was afraid the medications would cause him to die. Tr. 348. Plaintiff argues the ALJ erred by failing to acknowledge "this aspect of Fallaw's mental impairments and how it affected his insight into his treatment options." Pl. Mem. 18.

The Commissioner argues the ALJ's determination regarding Plaintiff's symptoms is supported by substantial evidence, because, *inter alia*, he "scrutinized Plaintiff's treatment history, which is an important indicator about the intensity and persistence of Plaintiff's symptoms." Def. Mem. 21 (citing 20 C.F.R. § 416.929(c)(3)). As noted by the Commissioner, the ALJ pointed out Plaintiff had declined to take daily medications for years, "despite his providers' recommendations[.]" *Id.*

While the Commissioner is generally correct that the ALJ can take the refusal for treatment into account, that is not without limits. *See Weibusch v. Comm'r, Social Security Admin.*, No. 20-1590, 2022 WL 2965653, at *4 (4th Cir. July 27, 2022) (affirming finding of non-disability and noting, *inter alia*, treating provider's notation that "explicitly tie[d] [claimant's] symptoms to medication noncompliance."); 20 C.F.R. § 416.929(c)(3) (stating an ALJ will consider what medications, treatments or other methods are used to alleviate symptoms); 20 C.F.R. § 416.903(b) (noting that failure to follow prescribed treatment "without a good reason" may result in a finding of non-disability). When considering prescription medications, it most often is appropriate for the ALJ to consider the reasons *why* a claimant, at times, does not take his medications as directed. As explained in *Daniels v. Berryhill*, No. CV 4:18–174-RMG, 2019 WL 2723694, at *5 (D.S.C. July 1, 2019),

> Certainly, a claimant's knowing and willful failure to comply with medical treatment can be a basis to deny a disability application under the Social Security Act. However, a determination that a claimant has been non-compliant does not end the analysis. Where a claimant's mental illness is the primary cause of non-compliance, such failure to comply with medical treatment should be recognized as a symptom of the claimant's mental illness and not provide the basis for the denial of disability benefits. In *Pate-*

*Fires v. Astrue*, 564 F. 3d 935, 945-46 (8th Cir. 2009), a widely cited and respected Social Security case on non-compliance arising from mental illness, the Eighth Circuit noted that "noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself, and, therefore, neither willful nor without a justifiable excuse . . . Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." Thus, **where an ALJ relies on a claimant's non-compliance with prescription medications to support a denial of a disability claim, the ALJ must include an explanation or discussion of the reasons, supported by the record, for his determination that noncompliance indicates willful conduct**.

*Daniels*, 2019 WL 2723694, at *5 (emphasis added). In *Daniels*, the court remanded, finding error in the ALJ's failure to determine whether claimant's non-compliance was a willful act or whether it was a manifestation of his mental illness. *Id. See also Nelson v. Saul*, No. CV 9:19-3275-RMG-MHC, 2021 WL 494987, at *6 (D.S.C. Jan. 26, 2021) (finding remand appropriate because, *inter alia*, the ALJ had used medication-noncompliance as a reason to discount a treating source's opinion without having determined whether such noncompliance was willful or without justifiable excuse), *report and recommendation adopted,* No. CV 9:19-3275-RMG, 2021 WL 492491 (D.S.C. Feb. 10, 2021); *McKoy v. Saul*, No. 7:19-CV-00223-FL, 2020 WL 8084961, at *9 (E.D.N.C. Nov. 22, 2020) (finding remand appropriate when ALJ had cited claimant's noncompliance with medication without exploring whether such compliance was willful or a manifestation of mental illness), *report and recommendation adopted,* No. 7:19-CV-223-FL, 2021 WL 76956 (E.D.N.C. Jan. 8, 2021).

Here, the ALJ focused on Plaintiff's "conservative" treatment, highlighting NP Cometto's notes that Plaintiff had "refused additional medications to target his anxiety" and indicating there had been "few changes in his medication since 2017[.]" Tr. 17. As pointed out by Plaintiff, the record belies the characterization of his medication history as one with "few changes." Pl. Mem. 17. To the contrary, NP Cometto regularly adjusted types and dosages of various medications in an attempt to better regulate Plaintiff's panic attacks. *See, e.g.*, Tr. 335-36 (May 20, 2019 visit to NP Cometto, in which she added prescription for Paxil and increasing dosage of Klonopin to one 2-mg tablet twice

per day), 344-49 (September 16, 2019 visit to NP Cometto in which Plaintiff was taken off of Paxil because it was "making [him] feel funny"; NP Cometto noting Plaintiff "[h]as tried multiple antidepressants and generally has been resistant to the medications."); 346-47 (January 15, 2020 visit to NP Cometto in which Plaintiff noted he always had an "impending sense of doom"; NP Cometto noting Plaintiff's inability to use coping skills and understand that he is having panic attack rather than more serious health issues; NP Cometto adding prescription for hydroxyzine, increasing Klonopin dosage, and noting she has suggested to Plaintiff that he "should really be on a daily medication to target his anxiety but he does not want to do this"); 515-16. (August 19, 2020 visit to NP Cometto, who notes little improvement and adds prescription for buspirone and Effexor).

Even more significantly, the ALJ failed to address NP Cometto's notes from Plaintiff's March 11, 2020 visit indicating Plaintiff had "refused to take other medications (SSRIs) that would target [panic attacks, paranoia, and irritability] fearing that he will die." Tr. 348. NP Cometto noted Plaintiff had built up a tolerance to Klonopin and the dosage could not be increased. She also noted she had attempted to augment the Klonopin with various other medications "without much success." Tr. 348. In her Medical Source Statement NP Cometto highlighted Plaintiff's "severe agoraphobia, paranoia and fear of dying" in addition to his anxiety when explaining the reasons for her opinion of Plaintiff's severe work-limitations. Tr. 552. This evidence begs the question of whether Plaintiff's noncompliance with taking certain potentially helpful medications was "willful" or a manifestation of his mental illness. Remand is required so that the ALJ can "make a specific factual determination of whether Plaintiff's non-compliance was willful, and, if not, this should not be a factor in evaluating his disability claim." *Daniels*, 2019 WL 2723694, at *5. On remand it may be appropriate to have NP Cometto speak to this issue.

C.  The ALJ's Consideration of Opinion Evidence

Plaintiff also submits that the ALJ erred in his consideration of opinion evidence, particularly NP Cometto's opinion. Pl. Mem. 12-16. Because this matter is being remanded for further focus on Plaintiff's treatment by NP Cometto, specifically including his medication noncompliance and NP Cometto's opinion regarding same, NP Cometto would be expected to provide an updated opinion. Accordingly, the court declines to address the ALJ's treatment of the existing opinion evidence at this time.

D.  The "fast-paced" limitation

Plaintiff's remaining substantive allegation of error relates to the use of the term "fast-paced" in the RFC. It is possible that the ALJ's RFC will change on remand, making consideration of this issue unnecessary at this juncture. However, to the extent the issue persists, the court offers the following analysis.

The ALJ found Plaintiff could "concentrate, persist, and maintain pace to understand, remember, and carry out unskilled, routine tasks, with a GED reasoning code of 2 or less, in a low-stress work environment (defined as being free of fast-paced or team-dependent production requirements)[.]" Tr. 15. Plaintiff ascribes error to the ALJ's use of the "non-functional term 'fast-paced,'" arguing the ALJ neither defined nor explained what he meant by "fast-paced." Pl. Mem. 19-20 (citing, *inter alia, Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019)).

In *Thomas*, the Fourth Circuit found several issues with the ALJ's RFC. Among other failings, the court found the ALJ's erred in finding the claimant could not perform work "requiring a production rate or demand pace" without providing sufficient information to "understand what those terms mean." 916 F.3d at 312. The court disagreed with the Commissioner's argument that the terms "production rate" and "demand pace" were commonly used, finding they were "not common enough for us [the Fourth Circuit] to know what they mean without elaboration." *Id.* This failing, combined

with other issues, combined to require remand so that the ALJ could provide a clearer "window into her reasoning" for giving claimant the RFC she gave. *Id.*

In *Perry v. Berryhill*, 765 F. App'x 869 (4th Cir. 2019), the Fourth Circuit somewhat similarly found the ALJ's lack of analysis made it "difficult if not impossible, to evaluate whether restricting [the claimant] to a 'non-production oriented work setting' properly accounted for [the claimant's] well-documented limitations in concentration, persistence, and pace." 765 F. App'x at 872. The *Perry* court distinguished *Thomas* and the *Perry* facts from another Fourth Circuit case, *Sizemore v. Berryhill*, 878 F.3d 72, 80-81 (4th Cir. 2017). In *Sizemore* the court affirmed an ALJ's RFC limitation to "non-production jobs," because the ALJ in *Sizemore* "provided additional context explaining that the claimant could perform work only in a 'low stress' setting, without any 'fast-paced work' or 'public contact,' to account for moderate limitations in concentration, persistence and pace." 765 F. App'x at 872 n.1. "Those descriptors," the court found, "helped to explain the restriction intended by the ALJ, and allowed us to evaluate whether that restriction adequately accounted for the claimant's limitations." *Id.* Indeed, the court in *Sizemore* found the very term to which Plaintiff here objects— "fast-paced work"—to be part of the explanation that made the *Sizemore* ALJ's RFC reviewable and supported by substantial evidence. 878 F.3d at 79, 81. As *Sizemore* makes clear, then, the usage of certain terms in the RFC does not automatically require reversal; rather, it is to be evaluated on a case-by-case basis to see if there is adequate explanation and substantial evidence to support the restriction. Further, numerous courts within the Fourth Circuit have found similar RFC terms sufficient and reviewable. *See Dawson v. Saul*, No. 218CV02521JMCMGB, 2020 WL 1822461, at *16 (D.S.C. Jan. 23, 2020) (collecting cases that found RFC restrictions such as the requirement of carrying out "simple, routine tasks in a low stress work environment (defined as being free of fast-paced or team-dependent production requirements" sufficient), *report and recommendation adopted*, No. 2:18-CV-02521-JMC, 2020 WL 728405 (D.S.C. Feb. 13, 2020). In other words, the alleged error

25

of which Plaintiff now complains may exist if an RFC restriction on its own cannot be understood by the reviewing court—either because it is not defined in the regulations, is not commonly used in case law, or is not otherwise self-explanatory. Even then, remand may not be required if the RFC provides ample context to permit review.

Here, the ALJ did not use "fast-paced" in a vacuum. Rather, the RFC limited Plaintiff to "a low stress work environment (defined as being free of fast-paced or team-dependent production requirements"). Tr. 15. A reviewing court can understand the meaning behind the phrase "fast-paced or team-dependent production requirements" on its own. Further, the ALJ provided additional context within the mental RFC that allows for meaningful judicial review. *See* Tr. 13-19. For example, the ALJ noted Plaintiff could "perform a variety of simple tasks" such as watching television, driving a vehicle, and cutting the grass. Tr. 14. The ALJ explained that, although difficulty concentrating was noted in at least one treatment note, mental status examinations "typically show that the claimant has intact attention and concentration and a logical/goal directed thought process." Tr. 14. The ALJ fully considered Plaintiff's testimony and reporting of daily activities, *and* the medical opinions of record. Tr. 14-19.

At bottom, the court finds the term "fast-paced" is understandable. Plaintiff's allegation of error is dismissed.

E.  Plaintiff's argument regarding alleged constitutional defect[14]

Plaintiff also argues the Commissioner's decision denying his SSI claim was constitutionally defective because the Act's provision that limits the President's authority to remove the Presidentially-appointed, Senate-confirmed Commissioner of Social Security without good cause, 42 U.S.C. § 902(a)(3), violates the separation of powers. Plaintiff submits that the appropriate remedy

---

[14] Because this matter is being remanded on another issue, consideration of this issue is largely academic.

for this violation of the separation of powers is for a new hearing before a properly appointed official. Pl. Br. 5-11. The Commissioner counters that Plaintiff's argument fails because he is unable to demonstrate compensable harm. Def. Br. 6-17.

As recently noted by Judge Mary Geiger Lewis, Section § 902(a)(3) of Title 42 "does in fact violate the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner of Social Security without good cause, but '[t]he conclusion that the removal restriction is [C]onstitutionally unenforceable does not affect the validity of the remainder of the [S]tatute.'" *Moore v. Kijakazi*, No. CV 6:20-03951-MGL, 2022 WL 702518, at \*4–5 (D.S.C. Mar. 9, 2022) (quoting Off. of Legal Couns., U.S. Dep't of Just., Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot., 2021 WL 2981542 (July 8, 2021)).[15]

As argued by the Commissioner, the United States Supreme Court recently explained in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), that, even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the "unconstitutional provision . . . inflict[ed] compensable harm." *Id.* at 1787–89; *see* Def. Br. 15-16.

Plaintiff argues that because the ALJ who adjudicated her claim served under authority delegated from a Commissioner who enjoyed unconstitutional removal protection, the denial of her claim automatically violates the separation of powers, thus necessitating a new hearing. The court disagrees. Unlike Appointment Clause defects, in which the presiding official does not enjoy proper authority to occupy the office, *Lucia v. SEC*, 138 S. Ct. 2044 (2018), agency action is not per se invalid simply because it can be traced back to an official subject to an unconstitutional removal protection. Instead, *Collins* teaches that, when an agency official is properly appointed, there can be no claim that he "exercise[d] . . . power that [he] did not lawfully possess." *Collins*, 141 S. Ct. at 1788; *see also id.* at 1788 n.23 ("the unlawfulness of the removal provision does not strip [an official]

---

[15] Plaintiff attached a copy of this Memorandum Opinion to his brief. *See* ECF No. 18-2.

of the power to undertake the other responsibilities of his office[.]"). Consequently, "there is no reason to regard any of the actions taken" by officials with tenure protection during this period "as void." *Id.* at 1787; *see also id.* at 1793 (Thomas, J., concurring) (when officials were properly appointed, there is "no barrier to them exercising power[.]").

*Collins* provides, therefore, that actions taken by properly appointed officials—which include both the ALJ who presided over Plaintiff's claim (whose appointment was ratified by then-Acting Commissioner Nancy Berryhill who was without tenure protections) and Commissioner Andrew Saul who occupied the office when the ALJ issued the decision (appointed by President Trump with the advice and consent of the Senate)—are not void.

Plaintiff's additional argument that the ALJ also enjoyed for-cause protection similar to the Commissioner, further demonstrating the unconstitutionality of the decision on his benefits claim, *see* Pl. Br. 8-11, is equally unavailing. Although *Collins* failed to involve such a dual-layer removal scheme, a recent case from the Ninth Circuit is instructive: *Decker Coal Co. v. Pehringer*, 8 F.4th 1123 (9th Cir. 2021). In that case, Decker Coal petitioned for review of an order of the Benefits Review Board that had affirmed the decision of a Department of Labor ALJ awarding benefits to a former coal mine worker under the Black Lung Benefits Act. *Id.* Like Plaintiff here, Decker Coal had alleged an unconstitutional two-layer removal scheme. *Id.* at 1128. The Ninth Circuit rejected this argument and pointed to *Collins*, opining "*Collins* is controlling with respect to the remedy for any unconstitutionality in the removal provisions[,]" and a plaintiff must show compensable harm. *Id.* at 1137.

In sum, Plaintiff simply is unable to show compensable harm. Plaintiff has failed to show how the President's supposed inability to remove the Commissioner or the ALJ without good cause possibly could have affected his disability benefits decision. As the Commissioner noted, Plaintiff has pointed to no compensable harm resulting from President Biden's decision to remove Andrew

Saul as Commissioner in July 2021. Def. Br. 12. As noted by Associate Justice Kagan in her *Collins* concurrence, "[g]ranting relief" where a plaintiff could not show that the President's inability to remove an agency head actually affected the decision at issue "would, contrary to usual remedial principles, put the plaintiffs 'in a better position' than if no constitutional violation had occurred." *Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring).

Plaintiff has demonstrated no actionable harm. This allegation of error is dismissed. *See also* S*tubbs v. Kijakazi,* , No. CV 6:20-3606-MGL-KFM, 2022 WL 557479, at *3 (D.S.C. Feb. 24, 2022) (finding remand on this constitutional argument unnecessary; collecting several cases and noting courts in the Fourth Circuit to be in accord).

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision was supported by substantial evidence. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is reversed and remanded pursuant to 42 U.S.C. § 405(g) for further administrative action.

IT IS SO ORDERED.

August 10, 2022                                    Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge